**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| TELECO, INC., WILLIAM M. ROGERS, and WILLIAM "BILLY" MICHAEL ROGERS II, | |
| Plaintiffs, | Civil Action No: 6:23-cv-03563-DCC |
| v. | |
| BRETT MUTOLO, | **AMENDED ANSWER TO SECOND AMENDED COMPLAINT** |
| Defendant. | **AND** |
| and | **COUNTERCLAIMS** |
| BRETT MUTOLO, | **AND** |
| Counterclaimant and Third-Party Plaintiff, | **THIRD PARTY COMPLAINT** |
| v. | **(Jury Trial Demanded)** |
| TELECO, INC., WILLIAM M. ROGERS, and WILLIAM "BILLY" MICHAEL ROGERS II, | |
| Counterclaim Defendants, | |
| and | |
| ROGERS FAMILY INVESTMENTS, LLC, NEW ERA ASSET MANAGEMENT, LLC, REAL ESTATE UNLIMITED, LLC, WMR & FAMILY, LLC, BOB ROGERS, and COLIN ROGERS, | |
| Third Party Defendants. | |

1

Defendant Brett Mutolo ("Mutolo" or "Brett") hereby answers the Second Amended Verified Complaint ("Complaint") and asserts counterclaims and third-party clams. This Amended Answer to Second Amended Complaint and Counterclaims and Third Party Claims is amended as a matter of right pursuant to Rule 15(a)(1) of the Federal Rules of Civil Procedure. Mutolo denies each and every allegation of Plaintiffs' Complaint except as specifically and expressly admitted herein. Paragraphs 1-231 herein correspond to Paragraphs 1-231 of the Complaint.

## FOR A FIRST DEFENSE
### (GENERAL DENIAL, RESPONSE TO ALLEGATIONS)

1.    Mutolo admits only that the Complaint arises under state law. Mutolo denies the remaining allegations of this paragraph.

2.    Mutolo admits only that Plaintiffs seek certain legal remedies. Mutolo denies the remaining allegations of this paragraph.

3.    Mutolo admits only that Plaintiffs seek certain legal remedies. Mutolo denies the remaining allegations of this paragraph.

4.    Mutolo admits only that Plaintiffs seek certain legal remedies. Mutolo denies the remaining allegations of this paragraph.

5.    Mutolo admits only that Plaintiffs seek certain remedies. Mutolo denies the remaining allegations of this paragraph.

6.    Mutolo admits only that Plaintiffs seek certain remedies. Mutolo denies the remaining allegations of this paragraph.

7.    Mutolo admits only that Plaintiffs seek certain remedies. Mutolo denies the remaining allegations of this paragraph.

8.      Mutolo admits only that Plaintiffs seek certain remedies.  Mutolo denies the remaining allegations of this paragraph.

9.      Mutolo lacks knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.

10.     Mutolo lacks knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.

11.     Mutolo lacks knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.

12.     Mutolo admits only that he is a citizen and resident of the State of Florida.  Mutolo denies the remaining allegations of this paragraph.

13.     Mutolo admits only that he was hired ostensibly as an independent contractor for Rogers Family Investments, LLC and subsequently became an employee of TELECO, and that he also worked for New Era Asset Management, LLC ("NEAM") on or after May 10, 2022, trading in the stock market.  Mutolo denies the remaining allegations of this paragraph.

14.     Denied.

15.     Admitted.

16.     Admitted.

17.     Denied.

18.     Mutolo lacks knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.

19.     Denied.

20.     Admitted, except that the concept of blockchain is not proprietary.

21.     Admitted.

22.     Mutolo lacks knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.

23.     Mutolo admits only that Cyndi is his aunt's mother.  Mutolo denies the remaining allegations of this paragraph.

24.     Mutolo admits only that he was hired as an independent contractor for Rogers Family Investments, LLC.  Mutolo denies the remaining allegations of this paragraph.

25.     Mutolo admits only that Bob Rogers was the owner of NEAM, that Mutolo worked for NEAM as a trader in the stock market, that Colin is Bob's grandson, and that Bill directed Bob and Colin to work with Mutolo.  Mutolo denies the remaining allegations of this paragraph.

26.     Mutolo admits only that he began working with Bob and Colin to determine the best way to invest in cryptocurrencies and digital assets.  Mutolo denies the remaining allegations of this paragraph.

27.     Mutolo admits only that Bob and Colin shared with Mutolo that their goal was to start a new investment fund for digital asset investments.  Mutolo lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

28.     Denied.

29.     Mutolo admits only that he told Colin the following, but Mutolo denies that he was trying to get access codes and passwords to cryptocurrency wallets:

> a.  Mutolo admits only that that he told Colin about how he had 200k+ worth of appreciated crypto & trading profit in Binance; and that once Binance split into two separate US and International entities he said that his assets were lost due to not switching the account to a US based account in time.  Mutolo lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of this subparagraph.

> b.  Admitted.

c.  Mutolo admis only that he and Colin recommended that they test some of Bill's Ethereum in a Liquidity Provision network called "Uniswap".

d.  Admitted.

e.  Admitted.

f.  Admitted.

g.  Admitted.

h.  Admitted.

i.  Admitted.

j.  Mutolo admits only that he introduced a new investment platform called Polkadot auction loan and recommended Colin and Bob should invest large amount of capital into this platform; and that after weeks of research he said that the prospective return was at least 100% of original Polkadot.

k.  Mutolo admits only that the aforementioned "Polkadot Auction Loans" were entered by Brett with Bill Sr.'s collateralized Bitcoin through Celsius; and that he said that he could further compound the initial return gain from investing in the project; and that Brett showed Colin Screenshots projecting between a 67% to 121% return for participating in the platform.

30.  Mutolo admits only that on or about March 4, 2022, he began working for TELECO as an employee. Mutolo denies the remaining allegations of this paragraph.

31.  Mutolo admits only that between May and July 2022, Billy Jr. instructed Colin and Brett to move Lynch and Corley virtual currencies off various exchanges to a wallet created by Colin Rogers. Mutolo denies the remaining allegations of this paragraph.

32.  Denied.

33.  Mutolo admits only that Colin and Billy Jr. were able to access the Ledger wallet initially but that Brett was given access in case Colin and Billy died. Mutolo denies the remaining allegations of this paragraph.

5

34.     Denied.

35.     Mutolo admits only that Billy Jr., in consultation with Bob, Brett and Colin, determined that they should exit their current strategies due to the bear market in digital assets. Mutolo denies the remaining allegations of this paragraph.

36.     Mutolo admits only that he discussed with Billy Jr., Bob, and Jim McNulty his trading on the KuCoin exchange.  Mutolo denies the remaining allegations of this paragraph.

37.     Mutolo admits only that he discussed with Jim his returns on KuCoin and that he could move Jim's investment from another strategy, the "Anchor Protocol," to KuCoin so he could trade Jim's funds and transfer them back.  Mutolo denies the remaining allegations of this paragraph.

38.     Mutolo admits only that he successfully invested Billy Jr.'s funds in something other than NEAR pursuant to authority and discretion given to him by Billy Jr.  Mutolo denies the remaining allegations of this paragraph.

39.     Admitted, except that the exhibit only contains a partial copy of the screenshot and except that he denies the screenshot was fictitious.

40.     Denied.

41.     Denied.

42.     Mutolo admits only that on or about April 30, 2023, he told Billy Jr., Jim, and Bob that he had a KuCoin account that was originally set up to allow United States ("US")-based clients to invest, manage and trade digital currency; and that he represented that although KuCoin had recently implemented a restriction on US-based entities trading derivatives, his account was "grandfathered in" and consequently he was allowed to continue trading derivatives.  Mutolo denies the remaining allegations of this paragraph.

6

43.     Mutolo lacks knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.

44.     Mutolo admits only that Jim, Billy Jr., TELECO, and Bob desired to pool funds for Mutolo to invest (with Plaintiffs, Colin, and Bob's guidance and supervision) in volatile coins and to show to Bob his trades and charting.  Mutolo denies the remaining allegations of this paragraph.

45.     Admitted.

46.     Admitted.

47.     Mutolo admits only that the total capital invested by Plaintiffs and others as of April 30, 2022, was $441,376.  Mutolo denies the remaining allegations of this paragraph.

48.     Mutolo admits only that on or about May 4, 2022, Billy Jr. sent an additional $15,546.86 to Mutolo's KuCoin account   Mutolo denies the remaining allegations of this paragraph.

49.     Mutolo admits only that Billy Jr. asked Bob and Mutolo about using Billy's cryptocurrency and Ethereum ("ETH") digital assets in Celsius Network, LLC ("Celsius"), another crypto trading platform, to obtain a loan from Celsius for the purpose of using the loan proceeds to invest in KuCoin; and that Bob told Billy Jr. to do this and to send the loan proceeds to Mutolo. Mutolo denies the remaining allegations of this paragraph.

50.     Mutolo admits only that Billy Jr. sent $77,000 of the loan proceeds to Mutolo to invest (with Plaintiffs, Colin, and Bob's guidance and supervision) in KuCoin and that TELECO sent $80,474.70 to Mutolo to invest (with Plaintiffs, Colin, and Bob's guidance and supervision) in KuCoin.  Mutolo denies the remaining allegations of this paragraph.

51.     Mutolo admits only that Bill Sr. through Real Estate Unlimited L.L.C. sent additional sums of $499,990 and $500,010 respectively, for a total of $1,000,000, to be invested

(with Plaintiffs, Colin, and Bob's guidance and supervision) in the beta test. Mutolo denies the remaining allegations of this paragraph.

52.    Mutolo admits only that as of the beginning of the day on May 6, 2022, the total invested by the Plaintiffs and others was $1,614,397.56. Mutolo denies the remaining allegations of this paragraph.

53.    Mutolo admits only that Plaintiffs instructed Mutolo to trade with 20% of certain capital. Mutolo lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

54.    Mutolo admits only that Plaintiffs instructed Mutolo to trade with 20% of certain capital. Mutolo lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

55.    Admitted.

56.    Mutolo admits only that the exhibit correctly shows the communications. Mutolo denies the remaining allegations of this paragraph.

57.    Mutolo admits only that he updated spreadsheets detailing the activity in the KuCoin account and specifically including returns or profits on their investments (and that the referenced exhibit includes such a spreadsheet); and that he also screen shared on a daily basis with Bob Rogers through Google Teams meetings in order to review each individual trade. Mutolo denies the remaining allegations of this paragraph.

58.    Mutolo admits only that in late May 2022 Plaintiffs indicated they were ready to exit the beta test and transfer their funds from Mutolo's KuCoin account to a wallet. Mutolo denies the remaining allegations of this paragraph.

59.    Mutolo admits only that KuCoin would only allow a small amount, roughly $20,000 per day, to be withdrawn from the account of an unverified user, which he communicated to Plaintiffs.  Mutolo denies the remaining allegations of this paragraph.

60.    Mutolo admits only that he continued to invest the digital assets in the KuCoin account with the guidance and supervision of Plaintiffs, Colin, and Bob.  Mutolo denies the remaining allegations of this paragraph.

61.    Mutolo admits only that KuCoin agreed to increase the withdrawal limit to $80,000 per day and that Plaintiffs directed him to withdraw funds at the daily maximum and transfer them to a wallet.  Mutolo denies the remaining allegations of this paragraph.

62.    Mutolo admits only that he was given access to the Ledger wallet to transfer certain assets to his MEXC account in case Colin and Billy died, and that he could trade BTC and ETH as a pair.  Mutolo lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

63.    Admitted.

64.    Mutolo admits only that KuCoin informed him that to get around the withdrawal limitations of an unverified user, there could be an automatic transfer to an Arbitrum wallet, and that he told this to Plaintiffs.  Mutolo lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

65.    Admitted.

66.    Admitted.

67.    Mutolo admits only that a new spreadsheet was created that would allow Mutolo to update the Arbitrum and KuCoin balances; that Mutolo showed the Plaintiffs and others cropped screenshots (because they did not like full screenshots and said they did not know what they were

looking at) of the Arbitrum wallet that contained the expected amount of $2,603,000 USDC; and that the referenced exhibit is correct and shows multiple numbers. Mutolo lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

68.    Mutolo admits only that the specified amounts were transferred from the Arbitrum wallet to the MetaMask wallet and then to Mutolo's MEXC account to prevent a rollback—as approved and requested by Plaintiffs and specifically discussed with Bob on a daily basis and also as recorded in the spreadsheet Mutolo filled out every morning. Mutolo denies the remaining allegations of this paragraph.

69.    Mutolo admits only that he explained the transfers to Billy Jr. Mutolo lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

70.    Mutolo admits only that Billy Jr. and Mutolo discussed and agreed to the transfers to Mutolo's personal MEXC account long before the transfers were made. Mutolo denies the remaining allegations of this paragraph.

71.    Admitted.

72.    Denied.

73.    Mutolo lacks knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.

74.    Mutolo admits only that Bill Sr., Billy Jr., Colin, and Chris Rogers planned to use Mutolo's personal MEXC account to liquidate various cryptocurrency coins from Plaintiffs', Jim's and other family members' accounts. Mutolo denies the remaining allegations of this paragraph.

75.     Mutolo admits only that funds belonging to him and others in his personal MEXC account were traded under the strategy referred to as Swing Trading; that funds belonging only to him in his personal MEXC account were traded under the strategy referred to as YOLO; that Brett owned $374,911.05 of the referenced $2,064,354.43 in the MEXC account (with Brett owning the total YOLO fund amount of $310,098.43 as well as a portion of the Swing Trading fund totaling $64,812.62), with the balance of $1,689,443.38 belonging to the Plaintiffs or other persons; and that Plaintiffs' portion was transferred to MEXC to avoid a collapse in Solana correctly anticipated by Mutolo.  Mutolo denies the remaining allegations of this paragraph.

76.     Mutolo admits only that the amount of capital in USDC/USDT invested (with Plaintiffs, Colin, and Bob's guidance and supervision) in the MEXC account as of June 22, 2022 was $2,342,568.56, with $374,911.05 of this amount owned by Mutolo.  Mutolo denies the remaining allegations of this paragraph.

77.     Mutolo admits only that he contacted Kathy Loflin at the recommendation and prompting of Colin to ask about the transfer of $1 million approved by Plaintiffs; and that she indicated that Billy Jr. had to approve the transfer.  Mutolo denies the remaining allegations of this paragraph.

78.     Mutolo admits only that  Andrew Weiner from MEXC reached out to grant VIP status, and that Mutolo connected Weiner to Billy Jr.  Mutolo denies the remaining allegations of this paragraph.

79.     Mutolo admits only that Billy Jr. instructed Mutolo to transfer $1.2 million from MEXC to a wallet; and that Mutolo and Colin had previously transferred funds from MEXC to a wallet and back.  Mutolo denies the remaining allegations of this paragraph.

80. Mutolo admits only that during this time period he was sick and suffered from Covid plus symptoms from his diagnosed Meniere's disease, including vertigo, falls, and nausea, and that he communicated this to Plaintiffs. Mutolo denies the remaining allegations of this paragraph.

81. Admitted.

82. Admitted.

83. Admitted.

84. Mutolo admits only that he gave login information and instructions to Colin on July 5, 2024; that Colin attempted to log in to the MEXC account but instead locked the account when he failed to follow instructions; and that Mutolo fully cooperated to work with Colin to get the account unlocked, without success. Mutolo denies the remaining allegations of this paragraph.

85. Mutolo admits only that he sent a PDF of the KuCoin account as attached in the referenced exhibit, which accurately displayed the current account balances. Mutolo denies the remaining allegations of this paragraph.

86. Mutolo admits only that on July 19, 2022, a chatroom was created for Billy Jr. and Andrew Weiner of MEXC to confer on getting an institutional account set up. Mutolo denies the remaining allegations of this paragraph.

87. Mutolo admits only that around this same timeframe, he claimed that MEXC told him it would be a week before the MEXC account(s) would be unlocked. Mutolo denies the remaining allegations of this paragraph.

88. Mutolo admits only that he burned himself and sent photos of the burn; that he did not tell the truth when he told Billy Jr. that he was burned by lighting; that he was struggling with stress, panic, and anxiety from the Plaintiffs' aggressive verbal assaults; with depression; and with

the severe manifestation of symptoms from Meniere's disease (including vertigo, falling, and nausea); and that his motivation was to get the Plaintiffs to give him some space and relent from verbal assaults. Mutolo denies the remaining allegations of this paragraph.

89.   Admitted.

90.   Mutolo admits only that the quoted language is correct. Mutolo denies the remaining allegations of this paragraph.

91.   Mutolo admits only that Lynch and Corley owned approximately $130,000 in total value of coins in the Ledger wallet that were not clearly segregated. Mutolo lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

92.   Mutolo admits only that he endeavored to segregate funds owned by him from funds owned by Plaintiffs or others before he could be blamed for Plaintiffs' efforts to convert Mutolo's personal MEXC account to an institutional MEXC account despite not having a proper domiciliary in the British Virgin Islands; that Mutolo had personal funds in the Ledger wallet and attempted to transfer these personal funds; that the Ledger wallet did not clearly segregate the funds within it but instead used numbers and letters; and that any transfer of Lynch and/or Corley's funds was a mistake. Mutolo denies the remaining allegations of this paragraph.

93.   Mutolo admits only that he agreed to return any coins belonging to Lynch and Corley and that he apologized to Billy Jr. and Colin. Mutolo denies the remaining allegations of this paragraph.

94.   Mutolo admits only that he could not move Jim's assets because they were frozen by the actions of Colin and Billy Jr. Mutolo lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

95.     Mutolo lacks knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.

96.     Mutolo admits only that Billy Jr. stated that Plaintiffs "decided to close Brett's personal account and start with new"; and that Colin provided Mutolo with three addresses to send the coins.  Mutolo denies the remaining allegations of this paragraph.

97.     Mutolo admits only that on that same day, he told Billy that he had spoken via Telegram to someone claiming to be with MEXC (but who may have been an imposter) and that she couldn't close his accounts but he demanded it be done, so she brought someone from "legal" into the call and they agreed they would do it for Mutolo.

98.     Admitted.

99.     Admitted.

100.    Admitted, except Mutolo denies that he claimed each subaccount had its own email address because some subaccounts used APIs.

101.    Admitted.

102.    Admitted, except Mutolo lacks knowledge or information sufficient to form a belief about whether Lara was with MEXC but instead knows only that Lara called Mutolo via Telegram and purported to be with MEXC (but may have been an imposter).

103.    Admitted.

104.    Admitted.

105.    Admitted, except Mutolo lacks knowledge or information sufficient to form a belief about whether the two contacts were with MEXC but instead knows only that through Telegram they purported to be with MEXC (but may have been imposters).

106.    Admitted.

107.    Mutolo lacks knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.

108.    Mutolo admits only that on August 2, 2022, at 10:04 PM, he called Billy Jr. and stated that he was told via Telegram that MEXC had closed the 28 subaccounts and moved the funds to the main account.  Mutolo denies the remaining allegations of this paragraph.

109.    Mutolo lacks knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.

110.    Admitted.

111.    Admitted, except that Mutolo denies that he terminated the call unilaterally because it was communicated to Billy Jr. and understood by Billy Jr. that Mutolo had to do Menier's therapy and would call back afterwards.

112.    Admitted.

113.    Admitted.

114.    Admitted.

115.    Admitted.

116.    Mutolo lacks knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.

117.    Mutolo lacks knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.

118.    Mutolo admits only that MEXC has a policy to take funds if fraud is alleged. Mutolo lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

119.    Mutolo lacks knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.

120.    Admitted.

121.    Admitted.

122.    Admitted.

123.    Mutolo admits only that he does remember telling Colin to refresh the screen but that this was to populate the screen properly as sometimes the website does not always load depending on the connection to the servers.  Mutolo lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

124.    Admitted.

125.    Admitted.

126.    Admitted.

127.    Admitted.

128.    Mutolo admits only that Bob and Billy Jr. told him that there were no funds in the MEXC and KuCoin accounts and that Mutolo believed them; and that Mutolo told them it was not his fault.  Mutolo denies the remaining allegations of this paragraph.

129.    Admitted.

130.    Mutolo admits only that he told Colin it was under and Arbitrum version of MetaMask.  Mutolo lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

131.    Mutolo admits only that he told Colin that it was under a Polygon configuration of the MetaMask wallet.  Mutolo lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

132.    Mutolo admits only that Colin was the one who kept the wallet recovery phrase, which Colin kept on metal tins.  Mutolo lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

133.    Mutolo admits only that he told Colin he had to terminate the Discord call in order to drive home from his sister's engagement party and the Colin wanted Mutolo to call him back when he arrived home.  Mutolo denies the remaining allegations of this paragraph.

134.    Mutolo admits only that he sent an encrypted file named "Waves.rtf" (using GPG encryption, the method that Colin and Mutolo had used for months to securely exchange sensitive account information) to Colin, that he was trying to find anything that might be the proper file for the encrypted information, that at the time he thought it was the Waves file, and that he later realized during efforts made in the joint courtroom session that it was not the correct file.

135.    Mutolo admits only that he was trying to locate the file even though it was Colin's responsibility, and that Colin told him he believed in him and that he could find it.  Mutolo denies the remaining allegations of this paragraph.

136.    Mutolo lacks knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.

137.    Mutolo admits only that he was not feeling well.  Mutolo denies the remaining allegations of this paragraph.

138.    Denied.

139.    Mutolo admits only that on Sunday August 7, 2022, two persons came to his family's home in an intimidating manner—flashing badges and giving the impression to the Mutolo family that they were police officers—and they stated they were hired by Chris Mylett (a convicted felon for mail fraud that Plaintiffs previously introduced to Mutolo as a paralegal and

who Plaintiffs brought into the courtroom with Judge Austin during proceedings in this case, representing him to be a paralegal); that they demanded Mutolo turn over computers and electronic devices in his possession, including ones belonging to Mutolo and not to TELECO; and that they intimidated Mutolo and his family to coerce him to give them his electronic devices. Mutolo denies the remaining allegations of this paragraph.

140. Mutolo admits only that he already was locked out of his MEXC and KuCoin accounts because of Plaintiffs' actions. Mutolo denies the remaining allegations of this paragraph.

141. Denied.

142. Mutolo denies that he used "Inspect Element" to alter balances and denies any misconduct or concealment, with the sole exception of claiming lightning burned his arm. Mutolo lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

143. Mutolo denies that he attempted to change the account balances. Mutolo lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

144. Mutolo admits only that the screenshot (which is only partially attached as the referenced exhibit) was shown to Billy Jr. and was accurate. Mutolo lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph.

145. Denied.

146. Mutolo admits only that in or about March 2022, Cyndi Jannuzzi, his aunt's mother and Plaintiff Bill Rogers' then fiancé, initiated asking Mutolo to invest approximately $600,000 in

digital assets or cryptocurrency (with Plaintiffs, Colin, and Bob's guidance and supervision). Mutolo denies the remaining allegations of this paragraph.

147.    Denied.

148.    Mutolo admits only that he informed Cyndi how her account was doing and that it was increasing.  Mutolo denies the remaining allegations of this paragraph.

149.    Admitted, but denies that the wealth was "alleged" because Mutolo actually did create the earnings for Cyndi.

150.    Mutolo lacks knowledge or information sufficient to form a belief about the truth of the amount in the account as of August 30, 2022.  Mutolo denies the remaining allegations of this paragraph.

151.    Mutolo admits only that any loss to Cyndi was caused by Plaintiffs, Bob, and/or Colin.  Mutolo denies the remaining allegations of this paragraph.

152.    Mutolo admits only that prior to April 30, 2022, he contacted Jim and told him that Mutolo had done some "testing" on trading digital assets on KuCoin and was showing returns. Mutolo denies the remaining allegations of this paragraph.

153.    Admitted.

154.    Mutolo admits only that he invested (with Plaintiffs, Colin, and Bob's guidance and supervision) Jim's digital assets, ultimately totaling approximately $871,287.  Mutolo lacks knowledge or information sufficient to form a belief about the truth of the amount in the account as of August 6, 2022.  Mutolo denies the remaining allegations of this paragraph.

155.    Admitted.

156. Mutolo admits only that he failed to respond to this request on July 5, and that all of the funds were present and accounted for on July 5. Mutolo denies the remaining allegations of this paragraph.

157. Denied.

158. Mutolo admits only that any loss to Jim was caused by Plaintiffs, Bob, and/or Colin. Mutolo denies the remaining allegations of this paragraph.

159. Mutolo admits only that Bob invested approximately $29,000 with Plaintiffs and wanted Mutolo to invest them (with Plaintiffs, Colin, and Bob's guidance and supervision) in synthetic stocks. Mutolo denies the remaining allegations of this paragraph.

160. Denied.

161. Mutolo admits only that Chris invested approximately $120,000 with Plaintiffs. Mutolo denies the remaining allegations of this paragraph

162. Denied.

163. Mutolo admits only that Corley owned approximately $30,000 in total value of coins in the Ledger wallet that were not clearly segregated. Mutolo denies the remaining allegations of this paragraph.

164. Denied.

165. Mutolo lacks knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.

166. Mutolo admits only that Lynch owned approximately $100,000 in total value of coins in the Ledger wallet that were not clearly segregated. Mutolo denies the remaining allegations of this paragraph.

167. Denied.

168.    Mutolo lacks knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.

169.    Mutolo realleges and incorporates the preceding paragraphs as if set forth fully herein.

170.    Mutolo admits only that South Carolina law imposes a duty of loyalty upon employees but not upon independent contractors, and that any duty owed by Mutolo was limited to periods of employment.  Mutolo denies any breach of any duty of loyalty and denies the remaining allegations of this paragraph.

171.    Mutolo lacks knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.

172.    Denied.

173.    Denied.

174.    Denied.

175.    Denied.

176.    Denied.

177.    Mutolo admits only that he consented to an injunction.  Mutolo denies the remaining allegations of this paragraph.

178.    Mutolo admits only that he consented to an injunction.  Mutolo denies the remaining allegations of this paragraph.

179.    Mutolo realleges and incorporates the preceding paragraphs as if set forth fully herein.

180.    Mutolo lacks knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph.

181.    Denied.

182.    Denied.

183.    Denied.

184.    Denied.

185.    Denied.

186.    Mutolo admits only that he consented to an injunction.   Mutolo denies the remaining allegations of this paragraph.

187.    Mutolo realleges and incorporates the preceding paragraphs as if set forth fully herein.

188.    Denied.

189.    Denied.

190.    Denied.

191.    Denied.

192.    Denied.

193.    Denied.

194.    Denied.

195.    Mutolo admits only that he consented to an injunction.   Mutolo denies the remaining allegations of this paragraph.

196.    Mutolo realleges and incorporates the preceding paragraphs as if set forth fully herein.

197.    Denied.

198.    Denied.

199.    Denied.

200. Denied.

201. Denied.

202. Denied.

203. Denied.

204. Denied.

205. Denied.

206. Mutolo realleges and incorporates the preceding paragraphs as if set forth fully herein.

207. Denied.

208. Denied.

209. Denied.

210. Denied.

211. Denied.

212. Denied.

213. Denied.

214. Denied.

215. Mutolo realleges and incorporates the preceding paragraphs as if set forth fully herein.

216. Denied.

217. Denied.

218. Denied.

219. Mutolo realleges and incorporates the preceding paragraphs as if set forth fully herein.

220.    Denied.

221.    Denied.

222.    Denied.

223.    Denied.

224.    Denied.

225.    Mutolo realleges and incorporates the preceding paragraphs as if set forth fully herein.

226.    Denied.

227.    Denied.

228.    Denied.

229.    Denied.

230.    Denied.

231.    Denied.

232.    Mutolo denies that Plaintiffs are entitled to any of the relief requested in the Amended Complaint.

**FOR A SECOND DEFENSE**
(AFFIRMATIVE DEFENSES)

233.    Mutolo realleges and incorporates the preceding paragraphs, as well as the allegations of the Counterclaims and Third-Party Claims below, as if set forth fully herein and pleads the following affirmative defenses:

    a.    Plaintiffs' claims are barred, in whole or in part, by the lack of subject matter jurisdiction.

24

b.      Plaintiffs' claims are barred, in whole or in part, by the failure to state a claim upon which relief can be granted.

c.      Plaintiffs' claims are barred, in whole or in part, by the failure to join a party under Rule 19(b).

d.      Plaintiffs' claims are barred, in whole or in part, by the statute of frauds.

e.      Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations.

f.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches.

g.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

h.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of in pari delicto.

i.      Plaintiffs' claims are barred, in whole or in part, by consent, permission, , authorization, ratification, and/or good faith

j.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver.

k.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of estoppel.

l.      Plaintiffs' claims are barred, in whole or in part, by their failure to mitigate damages.

m.      Plaintiffs' claims are barred, in whole or in part, by Mutolo's right to possession.

n.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of assumption of the risk.

o.      If Plaintiff sustained any injury or incurred any loss or damage as alleged in the Amended Complaint, the same resulted in whole or in part from an intervening and/or superseding cause and/or causes, and any action on the part of Mutolo was not the proximate cause of Plaintiffs' alleged injuries.

p.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of comparative negligence.

q.      Plaintiffs' claims are barred, in whole or in part, by the negligence of one or more of the Plaintiffs and/or others.

r.      If Plaintiff sustained any injury or incurred any loss of damage as alleged in the Complaint, the same were caused in whole or in part by acts or omissions of another or others over whom Mutolo neither exercised nor had any right of control, for which Mutolo is and was not responsible, and whose conduct Mutolo had no duty or reason to anticipate or control.

s.      Plaintiffs' claims are barred, in whole or in part, because of contractual terms between the parties and/or one or more of Plaintiffs having breached a contract with Mutolo.

t.      Plaintiffs' claims are barred, in whole or in part, by usage of trade, course of performance, and/or course of dealing between the parties.

u.      Plaintiffs' claims are barred, in whole or in part, by accord and satisfaction.

v.      Plaintiffs' claims are barred, in whole or in part, by the economic loss rule.

w.      Plaintiffs' claims are barred, in whole or in part, by their termination of Plaintiffs' employment.

x.      Plaintiffs' claims for punitive damages are barred, in whole or in part, by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and comparable provisions of the South Carolina Constitution or that of any other state whose laws may apply.

y.      Plaintiffs' claims for punitive damages are barred, in whole or in part, by the standards for awarding punitive damages in South Carolina.

z.      Plaintiffs' claims for punitive damages are barred, in whole or in part, by the terms, conditions, procedures, standards, and limitations of Sections 15-32-510 through 15-32- 540 of the South Carolina Code of Laws in response to any claim for punitive damages, including the provisions established in Section 15-32-530 limiting awards for punitive damages.

aa.      Plaintiffs' claims are barred, in whole or in part, by Mutolo's counterclaims and/or third-party claims, and/or such claims entitle Mutolo to a setoff.

bb.      Mutolo reserves the right to raise such further and additional defenses as may be available upon the facts to be developed in discovery and under applicable substantive law.

**FOR A THIRD DEFENSE**
(COUNTERCLAIMS AND THIRD-PARTY CLAIMS)

234.      Mutolo realleges and incorporates the preceding paragraphs as if set forth fully herein and pleads the following Counterclaims and Third-Party Claims against Plaintiffs (TELECO, INC. ("TELECO"), William M. Rogers ("Bill Sr."), and William "Billy" Michael Rogers II ("Billy Jr.")) (collectively, "Counterclaim Defendants") and Third-Party Defendants (Bob Rogers ("Bob"), Colin Rogers ("Colin"), Rogers Family Investments, LLC ("RFI"), and New Era Asset Management, LLC ("NEAM"), Real Estate Unlimited, LLC ("REU"), WMR & Family,

LLC ("WMR") (with Counterclaim Defendants and Third-Party Defendants collectively referenced herein as **"Mutolo Claim Defendants"**):

### Jurisdiction

235.    Mutolo Claim Defendants are all citizens and residents of South Carolina only and subject to the personal jurisdiction of this Court.

236.    Subject matter jurisdiction exists either through diversity jurisdiction, federal question jurisdiction, and/or supplemental jurisdiction.

### General Allegations

237.    Bill Sr. and Bob are brothers.

238.    Billy Jr. is Bill Sr.'s son.

239.    Colin is Bill Sr.'s grandson.

240.    Bill Sr, Bob, Billy Jr., and Colin ("the Rogers") all worked closely with Brett throughout his association with Plaintiffs between 2021 and 2022.

241.    Upon information and belief, TELECO, RFI, NEAM, REU, and WMR are owned by one or more of the Rogers and/or other family members.

242.    The Rogers are wealthy, and their family has prospered for decades through TELECO and Star2Star, which are telecommunications companies with offices in Florida and South Carolina.

243.    Rogers Sr. splits his time between these two states and at one point declared he was domiciled in Florida, where he met and ultimately lived with Cyndi, the mother of Brett's aunt.

244.    Rogers Sr. and his family also run a lucrative private hedge fund in which they invest funds from accredited investors outside the purview and oversight of the Securities and Exchange Commission.

245.    This hedge fund operates under the banner of NEAM.

246.    In 2021, Mutolo Claim Defendants were looking to break into the brave new world of crypto, which effectively converts the arcane art of cryptography into a dizzying array of moneymaking opportunities that can be maximized through the application of mathematical algorithms and protocols.

247.    Mutolo Claim Defendants were looking for someone with an understanding of cryptocurrencies to help them begin investing their capital in this new area.

248.    When they discovered Brett, he was a young man, only 24 years old, who was continuing his education at a local college and living with his parents in Florida.

249.    At this time, Brett was struggling to pay off school debts by digging pools.

250.    Mutolo Claim Defendants were aware before hiring him that he was struggling to pay off school debts by digging pools.

251.    At that time, Brett had struggled for many years with anxiety, depression, and debilitating dizzy spells (and loss of hearing in one ear) from Meniere's disease (collectively, "Health Conditions").

252.    Mutolo Claim Defendants were aware before hiring him that he was struggling with one or more of these Health Conditions.

253.    Before they met him, Brett had developed a knack for looking into projects/virtual currencies that had speculative value.

254.    Bill Sr. initiated the contact with Brett after learning about him through his girlfriend, Cyndi.

255.    Cyndi introduced Brett to Bill Sr. who hired Brett.

256.    In June 2021, Brett was hired ostensibly as an independent contractor for RFI be a part time financial analyst supervised by Bob and Colin Rogers.

257.    Brett's work involved researching cryptocurrencies and/or planning to invest cryptocurrencies.

258.    But in fact, Brett was an employee of RFI because he did not have any control over his work; RFI had all the control.

259.    Brett was hired by RFI to work 30 hours per week; however, he worked many more hours at the demand and insistence of RFI without being compensated for the additional work.

260.    The scope of his employment to be compensated within 30 hours of work did not include Mutolo investing Mutolo Claim Defendants' funds in his personal crypto accounts.

261.    Bill Sr. owned and controlled RFI.

262.    Brett reported to Bob and Colin for RFI.

263.    Bob and Colin both closely monitored and controlled all work Brett did for RFI.

264.    Brett subsequently requested certain health insurance benefits after his father lost a job, and Mutolo Claim Defendants then allowed Brett to become an employee of TELECO in order to obtain health insurance benefits, beginning March 2, 2022.

265.    Brett continued to report daily to Colin and Bob, who continued to monitor and supervise him very closely.

266.    But Colin and Bob did not work for TELECO, and Brett worked for TELECO in name only.

267.    The work hours, requirements, and substance did not change once Brett became an employee of TELECO.

268.    The compensation did not change after Brett became an employee of TELECO.

269.    Between May 10 and June 14, 2022, Brett also worked for NEAM as a trader in the stock market.

270.    Brett was an employee of NEAM.

271.    TELECO, NEAM, and RFI effectively were an amalgamation of enterprises without distinction in terms of Brett's work for them.

272.    Brett initially was paid a flat salary to work 30 hours per week ostensibly as a part time employee of RFI.

273.    This arrangement continued at TELECO but full time at 40 hours.

274.    Brett regularly worked more than 30 hours per week for RFI and then more than 40 hours per week for TELECO, and he often worked 70 hours or more per week.

275.    Yet Brett never was paid for more than the salary set for his 30 hours (for RFI) or 40 hours (for TELECO).

276.    Brett's work for NEAM was completely uncompensated outside of the salary paid by RFI or TELECO.

277.    Brett typically worked 40 hours per week for NEAM during the time he was employed (in addition to his hours for RFI/TELECO).

278.    Mutolo would meet with Bob Rogers almost every morning and afternoon in his employment with Bob and talk about the stock market and be mentored.

279.    Mutolo Claim Defendants promised to pay commissions to Brett calculated based upon 10% of profits earned at end of each day as reflected Billy Jr.'s spreadsheets ("RFI Commissions"), as well as commissions on trading for NEAM ("NEAM Commissions") (collectively, "Commissions").

280.    Mutolo earned the RFI and NEAM Commissions, but they were not paid.

281. Mutolo Claim Defendants further promised to pay but never paid for reimbursements ("Reimbursements") for expenses incurred by Brett such as subscriptions, computer, etc.

282. Brett was expected to be at the beck and call of Mutolo Claim Defendants at all times as part of his employment with RFI, TELECO, and NEAM.

283. Brett was on call constantly for RFI, TELECO, NEAM, and Mutolo Claim Defendants, whether it was night or day, weekday or weekend, or a working day or holiday.

284. Brett routinely would spend entire days in constant communication with Bob and Colin through various communication apps such as Discord, Telegram, and Discord.

285. Counterclaims Defendants, including RFI as the employer, purposefully and willfully misclassified Brett as an independent contractor for the purpose of evading federal laws governing overtime pay.

286. Brett originally kept track of his working hours and recorded them for Mutolo Claim Defendants, but Mutolo Claim Defendants asked him to stop keeping a record of his hours.

287. This request was made intentionally to avoid payment of overtime.

288. Counterclaims Defendants purposefully and willfully failed to pay Brett for overtime.

289. Brett had no option other than performing work beyond the agreed upon 30 hours without compensation in order to avoid termination.

290. Upon information and belief, Bob, Bill Sr., and Billy Jr. owned and controlled RFI, TELECO, and NEAM.

291. Billy Jr. was and remains the COO of NEAM.

292. Bob owned NEAM.

293.    Bob groomed Brett as a trader, telling Brett he was like a son to him.

294.    Bob even told Mutolo and wrote that he wanted him to take over the hedge fund and after Bob retired.

295.    Bob and Colin developed Brett's skills and began having Brett invest their money in Brett's personal accounts in or around May 2022.

296.    Instead of providing corporate accounts in which Brett would invest, Mutolo Claim Defendants persuaded him to invest their money in Brett's personal accounts (with KuCoin and MEXC) and would send the money to his accounts.

297.    Brett routinely asked about the corporate entities being set up.

298.    In this manner, Mutolo Claim Defendants purposefully sought to keep profits hidden from the IRS and thereby evade personal tax liability and/or burden Brett with their tax liability.

299.    Mutolo Claim Defendants manipulated and exerted control over Brett, working him all hours of the day and night.

300.    Brett was constantly on call and could not even attend a family wedding or social engagement without being available to Plaintiffs.

301.    His days were spent on "Discord" with Mutolo Claim Defendants, a computer-based method of texting and telecommunicating.

302.    Mutolo Claim Defendants exerted control over Brett's accounts and maintained the passwords imprinted on metal "tins."

303.    Mutolo Claim Defendants refused to pay the Commissions to Brett to which he was entitled.

304.    Jim would include line items for commissions to be paid to Brett on spreadsheets he prepared when instructing to make investments, which Mutolo Claim Defendants would delete when they forwarded the spreadsheets to Brett.

305.    Simultaneously with the failure to pay these Commissions, Mutolo Claim Defendants further made promises that Brett would be paid millions of dollars in the future when the fund launched and that he was being given the opportunity of a lifetime and should remain quiet, thereby manipulating and coercing Brett into silence and the mere hope that he would do what they said.

306.    Brett's investments earned millions of dollars for the Mutolo Claim Defendants.

307.    Brett also invested other funds in his personal KuCoin and MEXC accounts that did not belong to Mutolo Claim Defendants.

308.    These funds included personal funds and family funds.

309.    Brett lost access to his KuCoin and MEXC accounts after Mutolo Claim Defendants attempted to log into them, which resulted in them becoming frozen and locking out Brett from his own accounts (the "Lockdowns").

310.    Specifically, the MEXC account was frozen on July 5, 2022, when Colin, in concert with Mutolo Claim Defendants, coerced Brett to give him login information and logged in despite Brett warning them that they should not do it because it could get the account locked, which resulted in the MEXC account becoming frozen and locked down ("MEXC Lockdown").

311.    Although Mutolo worked with Colin to get the MEXC account unlocked, they could not get the account unlocked.

312.    Upon information and belief, following the MEXC Lockdown, the MEXC funds were dissipated through automated trades and/or other account activity beyond the control of Brett and/or through MEXC or some other third-party taking the funds.

313.    The KuCoin account was locked down when Mutolo Claim Defendants attempted unauthorized access to the account on or about August 6, 2022, when Mutolo Claim Defendants coerced Brett to give the log in information to them ("KuCoin Lockdown").

314.    This coercion included threats from Bill Sr. that Jim McNulty would sue all of them and that Brett would go to jail if he did not provide the information and threats from Bob that Brett should kill himself and that he was a waste of skin, all in an effort to coerce Brett to provide the necessary information to them to log in.

315.    Billy Jr. and Colin were on a call with Brett continuing the coercion when Colin attempted to log in despite Brett's warnings that it could lock down the account, and in fact it did result in the KuCoin Lockdown.

316.    Mutolo Claim Defendants thus obtained unauthorized access to Brett's KuCoin and MEXC accounts without his consent.

317.    Mutolo Claim Defendants then sent private investigators to Brett's parents' home on August 7, 2022, in order to take his physical computer devices and phones in the hopes that they could access the accounts and unlock them.

318.    These private investigators flashed badges at Brett and his parents and threatened them with devastating government action if Brett failed to turn over not only Plaintiffs' devices but also Brett's personal computer and phone (collectively, "Devices").

319.    Under this coercion and manipulation, Brett unwillingly gave them the Devices.

320.     Mutolo Claim Defendants promptly used the Devices in an attempt to log into the accounts, without Brett's consent or permission, but the accounts were frozen and/or locked down even further.

321.     They remained frozen and untouched from that point in time until the accounts were accessed by all parties in the Courtroom as part of the proceedings of this lawsuit.

322.     Colin and Billy Jr. were acting on behalf of the Mutolo Claim Defendants at the time of the Lockdowns.

323.     At the time of the Lockdowns, there was a total of approximately $26,000,000 in the accounts ("Total Funds").

324.     Of the Total Funds, approximately $1,600,000 belonged to Brett personally, with approximately $70,000 of this amount representing the initial investment.

325.     Of the Total Funds, approximately $700,000 belonged to Paul Mutolo, Brett's father, with approximately $60,000 of this amount representing the initial investment.

326.     Of the Total Funds, approximately $1,200,000 belonged to Cyndi, with approximately $600,000 of this amount representing the initial investment.

327.     Upon information and belief, the current amount of funds in the KuCoin and MEXC accounts is less than $100.

328.     Upon information and belief, the Total Funds either (a) were converted by KuCoin and MEXC or some bad actor associated with these exchanges, (b) were seized by KuCoin and MEXC due to the false claims of fraud made by Mutolo Claim Defendants; and/or (c) were liquidated in trades that continued to be executed without the ability of Brett to access the accounts and discontinue trading.

329.    Thus, the "Total Funds" were completely lost as a result of the Lockdown, and the Lockdown was caused by Mutolo Claim Defendants.

330.    Accordingly, the losses claimed by Mutolo Claim Defendants were due to their own actions.

331.    Furthermore, Brett is entitled to recover from Mutolo Claim Defendants any portion of the Total Funds in the account that did not belong to Mutolo Claim Defendants.  These funds total approximately $3,500,000.

332.    Fortunately, Brett withdrew $90,000 of his personal funds from the accounts prior to the Lockdown in order to pay off his school debts, and so Mutolo Claim Defendants are not responsible for these amounts.

333.    No other funds were withdrawn by Brett before the Lockdowns.

334.    The accounts remained frozen until unlocked and unfrozen during the course of efforts made during this litigation pursuant to the Court's injunction.

335.    No funds have been withdrawn by Brett after the Lockdowns, nor could they have been due to the accounts being frozen.

336.    Upon information and belief, KuCoin and MEXC are overseas exchange not regulated by the SEC and not within the jurisdiction of the United States.

337.    Accordingly, there is no recourse in the United States against these exchanges.

338.    Mutolo Claim Defendants were well aware of these risks when they manipulated Brett into investing their funds in these exchanges.

339.    Around the time of the Lockdowns, , Bob, Bill Sr., Billy Jr., and Colin excoriated Brett with vile and disgusting verbal statements, including the following:

      a.    Bill Sr., Bob, and Billy Jr. repeatedly told Brett it was his fault.
      b.    Bob told Brett he wished that Brett would die.

    c.  Billy Jr. told Brett that the loss of funds was all his fault and that he was going to jail and will get sued.

    d.  Billy Jr. told Brett that he is a piece of [expletive] and that he hopes I die.

    e.  Bob told Brett he was a piece of [expletive] son and a waste of skin.

    f.  Bob told Brett he was going to prison and that the FBI will lock him up.

340.  These statements to Brett led him to feel suicidal because they convinced him at the time that he was to blame because he was the owner of the accounts and because they threatened him with criminal action and incarceration.

341.  Because of Brett's Health Conditions, which were well known to Mutolo Claim Defendants, Brett is a "vulnerable adult" entitled to certain protections under the law.

342.  Mutolo Claim Defendants exploited Brett in violation of these protections and to serve their own gains, by manipulating Brett into long hours of work that he otherwise would not have done.

343.  Their pressure upon Brett triggered his anxiety, depression, and Meniere's, resulting in increasing the severity of his Health Conditions.

344.  The private investigators, through manipulations, threats, and impersonating police officers, harassed Brett's family and converted Brett's personal property, to which they had no right to take from him.

345.  The subsequent accessing Brett's personal online accounts without Brett's consent or permission—not only in August 2022 but also other times including times after the lawsuit commenced—were accomplished without Brett's consent or permission.

346.  RFI, NEAM, TELECO, REU, and WMR were effectively operated as a single business enterprise by Bill Sr., Billy Jr., Bob, and Colin, and so all Mutolo Claim Defendants are responsible and liable under all claims under the single business enterprise theory.

**For a First Cause of Action**
**(Payment of Wages Act)**

347.   Mutolo realleges and incorporates the preceding paragraphs as if set forth fully herein.

348.   RFI, NEAM, TELECO, Bill Sr., Billy Jr., and Bob each were an "employer" of Mutolo as defined in the South Carolina Wage Payment Act, S.C. Code Ann. § 41-10-10 et seq.

349.   Bill Sr., Billy Jr., and Bob were employers because they were agents of RFI, NEAM, and/or TELECO and had control over operations, setting pay policies, and the payment of wages to Brett.

350.   As part of Mutolo's compensation, he was entitled to a negotiated salary for part time work up to 30 hours per week with RFI and then up to 40 hours per week with TELECO, which was paid to him.

351.   Mutolo also was entitled to payment at the same hourly rate for hours worked above 30 hours in any particular week for RFI or more than 40 hours for TELECO, which never was paid to him.

352.   Mutolo also was entitled to compensation at 1.5 times the same hourly rate for hours worked above 40 hours in any particular week, which never was paid to him.

353.   Mutolo also was entitled to certain Commissions promised to him, which never were paid to him.

354.   The above amounts (collectively, "Unpaid Wages") were wrongly and intentionally withheld.

355.   RFI, NEAM, TELECO, REU, and WMR were effectively operated as a single business enterprise by Bill Sr., Billy Jr., and Bob, and so all six of these Mutolo Claim Defendants are responsible and liable under the single enterprise theory for all Unpaid Wages.

356.    Per S.C. Code Ann. § 41-10-80(c), Mutolo is entitled under the Act to recover from Mutolo Claim Defendants[1] "an amount equal to three times the full amount of the unpaid wages, plus costs and reasonable attorney's fees as the court may allow."

357.    Mutolo also is entitled to prejudgment and post-judgment interest.

**For a Second Cause of Action**
**(Fair Labor Standards Act)**

358.    Mutolo realleges and incorporates the preceding paragraphs as if set forth fully herein.

359.    RFI, NEAM, TELECO, Bill Sr., Billy Jr., and Bob each were an "employer" of Mutolo as defined in the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203(d) and/or an "enterprise" as defined in FLSA § 203(r) (because, inter alia, it engages in commerce with an annual revenue in excess of $500,000.00) and/or horizontal and/or vertical joint employers within the meaning of 29 C.F.R. § 791.2 (because they have an arrangement to share the services of Brett, act in the interest of one another in relation to Brett, and/or shared control over Brett, either directly or indirectly, because they control, are controlled by, or are under common control with another).

360.    Bill Sr., Billy Jr., and Bob were employers because they were agents of RFI, NEAM, and/or TELECO and had control over operations, setting pay policies, and the payment of wages to Brett.

361.    The FLSA requires that employers pay non-exempt employees at least their regular rate of pay for all hours worked and overtime at a rate of one and one half times the employee's regular rate of pay for hours worked over forty (40) in a workweek.

---

[1] Excluding Colin.

362.    Mutolo Claim Defendants[2] knew or should have known that it suffered or permitted Brett to perform work integral to their operations without appropriate compensation, and their conduct as set forth above has been willful, not in good faith, and has caused significant damages to Brett.

363.    Brett is entitled to damages in an amount equal to his Unpaid Wages, including unpaid overtime at 1.5 times, and an additional equal amount as liquidated damages, plus a reasonable attorney's fee and the costs of the action pursuant to FLSA § 216(b).

364.    Brett is entitled to these damages for Unpaid Wages worked within the three years preceding the filing of Plaintiffs' Complaint, plus periods of equitable tolling, because the employers acted willfully and knew, or showed reckless disregard of whether, its conduct was prohibited by the FLSA.

365.    Mutolo also is entitled to prejudgment and post-judgment interest.

### For a Third Cause of Action
**(Breach of Contract)**

366.    Mutolo realleges and incorporates the preceding paragraphs as if set forth fully herein.

367.    Brett and Mutolo Claim Defendants[3] had one or more agreements between them, based upon a mutual understanding expressed through words, conduct, and implied terms, that Brett would be paid wages, the RFI Commissions, NEAM Commissions, and Reimbursements ("Contracts").

368.    Mutolo Claim Defendants breached these Contracts when they failed to pay the amounts due to him.

---

[2] Excluding Colin.
[3] Excluding Colin under this cause of action.

369.    Mutolo Claim Defendants contractually agreed to pay Mutolo the above amounts, including wages, Commissions, and Reimbursements ("Contract").

370.    Mutolo fully performed all conditions of the Contract.

371.    Mutolo Claim Defendants breached the Contract by failing to pay the promised amounts.

372.    These breaches caused actual damages to Mutolo in the amount of Unpaid Wages and Reimbursements to be determined at trial, plus prejudgment and post-judgment interest.

### For a Fourth Cause of Action
### (Violation of Vulnerable Persons Act)

373.    Mutolo realleges and incorporates the preceding paragraphs as if set forth fully herein.

374.    The South Carolina's Omnibus Adult Protection Act, S.C. Code Ann. 43-35-5 et seq. is designed to protect vulnerable adults from abuse, neglect, and exploitation.

375.    Under S.C. Code Ann. § 43-35-10, a "vulnerable adult" is defined as "a person 18 years or older who has a physical or mental condition that substantially impairs the person from providing self-care or managing his or her own affairs."

376.    The Florida Adult Protective Services Act (§ 415.101 et seq.) effectively provides the same relief as the South Carolina Statute.

377.    Due to the status of his Health Conditions during the time of his employment with Mutolo Claim Defendants, which were known to Mutolo Claim Defendants, he was in a particularly vulnerable position at that time and met the definition of "a person 18 years or older who has a physical or mental condition that substantially impairs the person from providing self-care or managing his or her own affairs."

378.    His chronic Health Conditions resulted in him being unable to sufficiently provide self-care and manage his affairs, and so was substantially impaired.

379.    The impairment worsened over the time that Mutolo was employed by Mutolo Claim Defendants, reaching a nadir in July 2022.

380.    Mutolo Claim Defendants used a dynamic of exploiting Mutolo's mental and emotional vulnerability using a combination of positive reinforcement and fear tactics, including manipulation, emotional coercion, promises of future riches, yelling, threats, calls to kinship, and pressure to influence and control Mutolo.

381.    Through alternating acts of kindness and veiled threats, these manipulators confused and destabilized Mutolo, making him feel dependent and fearful and unable to resist their influence.

382.    Mutolo Claim Defendants essentially created a false sense of trust while simultaneously using intimidation to maintain control.

383.    Exploitation is defined under the Act as the improper or illegal use of a vulnerable adult's resources for another person's benefit.

384.    Exploitation extends to "(a) causing or requiring a vulnerable adult to engage in activity or labor which is improper, unlawful, or against the reasonable and rational wishes of the vulnerable adult."

385.    Exploitation extends to "(b) an improper, unlawful, or unauthorized use of the funds, assets, [or] property . . . of a vulnerable adult by a person for the profit or advantage of that person or another person."

386.    Exploitation extends to "(c) causing a vulnerable adult to purchase goods or services for the profit or advantage of the seller or another person through: (i) undue influence, (ii)

harassment, (iii) duress, (iv) force, (v) coercion, or (vi) swindling by overreaching, cheating, or defrauding the vulnerable adult through cunning arts or devices that delude the vulnerable adult and cause him to lose money or other property."

387.    The actions and manipulations of the Mutolo Claim Defendants of Mutolo as described above exploited Mutolo by resulting in keeping him engaged in work for multiples of the agreed upon 30 hours per week; in getting him to work on weekends and holidays, at all hours of the night and day, and during family events; in giving over to them use of his own personal crypto exchange accounts to invest the Mutolo Claim Defendants' funds without receiving compensation; in freely sharing with them the benefits of the valuable and unique knowledge of a person who possessed a knack for earning millions of dollars in investing in crypto; and in giving them access to the accounts where they ultimately got Mutolo locked out of his own accounts and losing access to the funds therein.

388.    This exploitation qualifies as each of subsections (a), (b), and (c) of the definition of exploitation cited above and/or under the Florida Act's counterparts at section 415.102(8).

389.    The Act authorizes a private cause of action for exploitation, pursuant to S.C. Code § 43-35-80.

390.    Under either the SC or Florida statute, the exploitation resulted in the loss to Mutolo of approximately $3.5 Million of funds in his personal crypto accounts that did not belong to Mutolo Claim Defendants.

391.    Mutolo is entitled to actual damages for the exploitation to be determined at trial, plus punitive damages, attorneys' fees and costs, and prejudgment and post-judgment interest.

**For a Fifth Cause of Action**
**(Florida Statute § 934.10)**

392.    Mutolo realleges and incorporates the preceding paragraphs as if set forth fully herein.

393.    The Complaint references an audio recording of Mutolo at footnote 8 within paragraph 92.

394.    Upon information and belief, Mutolo was in Florida at all relevant times when any such recording could have been made.

395.    Florida is a two-party consent state under its wiretapping law, meaning that all parties involved in a private conversation must consent to any recording of the conversation.

396.    Mutolo did not consent to any audio recording made by Mutolo Claim Defendants.

397.    Under Florida Statute § 934.10, Mutolo is entitled to recover from Mutolo Claim Defendants actual damages (but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher), plus punitive damages, a reasonable attorney's fee and other litigation costs reasonably incurred.

**For a Sixth Cause of Action**
**(Unfair Trade Practice)**

398.    Mutolo realleges and incorporates the preceding paragraphs as if set forth fully herein.

399.    Upon information and belief, the Mutolo Claim Defendants' actions as described above constituted an unfair and/or deceptive trade practice in the conduct of trade or commerce, in violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code Ann. § 39-5-10 et seq. and/or the equivalent Florida Act (§ 501.201 et seq.).

400.    Mutolo Claim Defendants' actions either have resulted in such unfair and deceptive trade practices occurring repeatedly in the past or create a likelihood of repetition in the future.

401.    The unfair trade practices have an adverse impact on the public interest.

402.    Upon information and belief, the SCUTPA violation was willful, as Mutolo Claim Defendants knew or should have known their conduct was a violation of the SCUTPA.

403.    As a direct and proximate result of the SCUTPA violation, Mutolo has incurred damages in the amount of the lost funds totaling $3,500,000 and other damages to be determined at trial, plus treble damages, attorneys' fees, costs, and prejudgment and post-judgment interest.

**For a Seventh Cause of Action**
**(Breach of Fiduciary Duty)**

404.    Mutolo realleges and incorporates the preceding paragraphs as if set forth fully herein.

405.    Mutolo reposed special confidence in Mutolo Claim Defendants by granting them access to his crypto accounts such that Mutolo Claim Defendants owed fiduciary duties (including duties of good faith, loyalty, and due care) to Mutolo.

406.    Mutolo Claim Defendants breached these duties by causing the Lockdowns, resulting in Mutolo losing approximately $3.5 Million in funds.

407.    As a direct and proximate result of these breaches, Mutolo has incurred damages in the amount of the lost funds totaling $3,500,000 and other actual damages to be determined at trial, plus punitive damages, attorneys' fees, costs, and prejudgment and post-judgment interest.

**For an Eighth Cause of Action**
**(Promissory Estoppel)**

408.    Mutolo realleges and incorporates the preceding paragraphs as if set forth fully herein.

409.    Mutolo Claim Defendants[4] made clear and unambiguous promises to Mutolo that he would be paid the amounts described as wages above.

410.    Mutolo reasonably relied upon these promises when he worked for Mutolo Claim Defendants and gave them access to his accounts.

411.    Mutolo's reliance was expected and foreseeable by Mutolo Claim Defendants.

412.    Mutolo was injured in reliance on the promises by virtue of working for Mutolo Claim Defendants without compensation and by losing access to his funds.

413.    Mutolo Claim Defendants accordingly are liable for the damages proximately sustained by Mutolo in its reliance upon such promises, including damages in the amount of the lost funds totaling $3,500,000 and other actual damages to be determined at trial, plus punitive damages, attorneys' fees, costs, and prejudgment and post-judgment interest.

### For a Ninth Cause of Action
**(Conversion)**

414.    Mutolo realleges and incorporates the preceding paragraphs as if set forth fully herein.

415.    Mutolo had legal title and ownership the Devices taken from his home on August 7, 2022, by agents of the Mutolo Claim Defendants.

416.    Mutolo Claim Defendants converted these stolen items to their own use without Mutolo's permission.

417.    The conversion has proximately resulted in damages to Mutolo in the amount of the value of the stolen items, plus pre and post judgment interest.

418.    Mutolo also is entitled to recover punitive damages in an amount to be determined by the jury.

---

[4] Excluding Colin for this cause of action.

## For a Tenth Cause of Action
### (Computer Fraud and Abuse Act)

419.    Mutolo realleges and incorporates the preceding paragraphs as if set forth fully herein.

420.    Mutolo Claim Defendants violated the Computer Fraud and Abuse Act (CFAA), codified at 18 U.S.C. § 1030, by working in concert to access his KuCoin and MEXC accounts ("Online Accounts") through coercion and/or without his consent or authorization.

421.    The Online Accounts were a "protected computer" under the CFAA, and Mutolo Claim Defendants accessed these accounts either without authorization or by exceeding authorized access ("Unauthorized Access").

422.    The Unauthorized Access first occurred with respect to the MEXC account on July 5, 2022, and first occurred with respect to the KuCoin account on August 6, 2022 (as set forth above herein), and has continued to occur.

423.    The Unauthorized Access was intentional; the Mutolo Claim Defendants acted purposefully, rather than accidentally, in gaining access to the Online Accounts.

424.    The Unauthorized Access proximately caused damage or loss to Brett by causing the Lockdowns that prevented him from accessing his own Online Accounts, thereby resulting in the loss to Mutolo of approximately $3.5 Million of funds in his personal crypto accounts that did not belong to Mutolo Claim Defendants.

425.    Accordingly, the intentional Unauthorized Access caused damage and loss as defined in the CFAA, and/or recklessly caused damage (with damage defined as "any impairment to the integrity or availability of data, a program, a system, or information" and loss defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior

to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."

426.    Brett is entitled to recover compensatory damages to be determined at trial pursuant to CFAA § 1030(g).

**WHEREFORE**, having answered the Second Amended Complaint of the Plaintiffs and asserted cross-claims and third-party claims, Mutolo prays as follows:

(a) that the Second Amended Complaint be dismissed with costs;

(b) that he be given a jury trial;

(c) that Judgment be entered in his favor;

(d) that he be granted the relief requested his counterclaims and third-party claims;

(e) that he be awarded its costs and attorneys' fees; and

(f) that the Court order such other and further relief as it considers proper.


Respectfully submitted,

**WYCHE, P.A.**

*s/William M. Wilson III*
William M. Wilson III (Fed. I.D. # 07611)
200 E. Broad St., Suite 400
Greenville, SC 29601
Phone:  864-242-8200
Fax:  864-235-8900
bwilson@wyche.com

September 17, 2024
Greenville, South Carolina            ***Attorneys for Defendant Brett Mutolo***